498

PACIFIC NORTHWEST FINANCE CORPORATION, PETITIONER, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 112722.   Promulgated March 24, 1944.

*William B. Finlay, C. P. A.*, for the petitioner.
*T. M. Mather, Esq.*, for the respondent.

## OPINION.

BLACK, *Judge*: The petitioner's first assignment of error, (a), complains that the Commissioner erred in including the entire amount of $6,135 which it received in 1940 from the insurance company as gross income for 1940. As a matter of fact, petitioner itself included this amount as gross income under the heading of "dividends received" in its income tax return filed for the year 1940 and paid the tax which it calculated thereon. It is not very clear from the statements and arguments made in petitioner's brief why it now contends that this amount of $6,135 should not be included in its gross income for 1940. Of course petitioner is within its rights in so contending if it did in fact err in reporting this $6,135 as gross income for 1940.

But we find no error in the petitioner reporting and the Commissioner determining that this amount was gross income to petitioner in 1940. Petitioner filed its income tax returns for all the years of its existence on a cash receipts basis. There is no controversy that petitioner actually received this $6,135 in 1940 from the insurance company and no reason has been shown why this amount should not be

included in its gross income. If some parts of this amount were included in petitioner's income tax returns for the years 1930 and 1931, a fact which has by no means been proved in this case, petitioner still could not prevail on this point, it being on the cash basis. However, we think it is unnecessary to discuss that phase of the matter, because petitioner has not proved that any part of the $6,135 which it received in the year 1940 from the insurance company had ever been returned by it for taxation in any prior year. It seems to be petitioner's contention that this $6,135, having been accrued over a period of several years, should not be taxed to petitioner all in one year. There is nothing unusual about such a situation for one who is on the cash basis. It has been stipulated that petitioner filed income tax returns for 1933 to 1939. inclusive, which had written on them "no business transacted in this company during the year" and reported no income.

It does not seem to be petitioner's contention that the amounts due petitioner in each year from the insurance company under the participating agreement were credited to the petitioner's account in such a manner on the insurance company's books as to amount to a constructive receipt by petitioner. Even if such contention had been made, the evidence does not sustain it. The evidence is clear and undisputed that the $6,135 here in question was received by the petitioner during the taxable year. In *Alice H. Moran, Executrix,* 26 B. T. A. 1154, it was held:

Where a taxpayer on the cash basis has consistently followed the practice over a long period of years of excluding from his return income which he did not receive in such years, but which he could have received had he so desired, he may not invoke the doctrine of constructive receipt when such income is actually received and thus have the income placed in a year where a tax thereon may not be collected.

In affirming that decision, *Moran* v. *Commissioner* (C. C. A., 1st Cir.), 67 Fed. (2d) 601, the court said:

\* \* \* The present case is not different in principle from those in which a taxpayer, having the right to file either one of two different sorts of returns, makes his choice and files his returns accordingly. It is settled that he cannot afterwards change. \* \* \*

The petitioner being on the cash basis, the income here in question was properly taxable to the petitioner for the year 1940, when received. On this assignment of error petitioner is not sustained.

Petitioner's next assignment of error is that the Commissioner erred in holding that the petitioner is a personal holding company and liable for the personal holding company surtax. In this assignment of error we think petitioner must be sustained.

504

The applicable statutes are printed in the margin.[1]

Petitioner concedes that in so far as the stockholding requirements are concerned it falls within the statutory provisions for personal holding companies, but it denies that its income was of the sort required by section 502. As has already been stated, petitioner, on the income tax return which it filed for 1940 on Form 1120, reported as dividends the $6,135 which it had received in that year from the insurance company and paid the tax which it computed thereon. Plainly petitioner was in error in designating the $6,135 as dividends. The insurance company was a mutual company with no stockholders and the $6,135 could not have been paid to petitioner as dividends. Petitioner owned no proprietary interest whatsoever in the insurance company. It merely had the right under certain conditions to receive a part of its gross receipts. This right was contractual and not proprietary. The Commissioner has determined that the $6,135 in question was interest. He makes no contention that it was dividends. If the Commissioner was correct in his determination that the payments were interest, then petitioner is a personal holding company, because it had no other business dealings or income and its entire income would be interest, thus bringing it within the provisions of section 502, printed in the margin.

We do not believe, however, for reasons which we shall presently state, that the $6,135 in question can properly be classed as interest. For a full discussion of the meaning of interest as that term is used in section 502, see *Elverson Corporation*, 40 B. T. A. 615, 643, et seq., affd., 122 Fed. (2d) 295. In that case we held that certain profits or compensation which the taxpayer realized from dealings with its debtor, although denominated by the Commissioner as interest, were not in fact interest and therefore the corporation was not a personal holding company.

---

[1] SEC. 501 [Internal Revenue Code]. DEFINITION OF PERSONAL HOLDING COMPANY.

(a) GENERAL RULE.—For the purposes of this subchapter and chapter 1, the term "personal holding company" means any corporation if—

(1) GROSS INCOME REQUIREMENTS.—At least 80 per centum of its gross income for the taxable year is personal holding company income as defined in section 502; but if the corporation is a personal holding company with respect to any taxable year beginning after December 31, 1936, then, for each subsequent taxable year, the minimum percentage shall be 70 per centum in lieu of 80 per centum, until a taxable year during the whole of the last half of which the stock ownership required by paragraph (2) does not exist, or until the expiration of three consecutive taxable years in each of which less than 70 per centum of the gross income is personal holding company income; and

(2) STOCK OWNERSHIP REQUIREMENT.—At any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

SEC. 502. PERSONAL HOLDING COMPANY INCOME.

For the purposes of this subchapter the term "personal holding company income" means the portion of the gross income which consists of:

(a) Dividends, interest (other than interest constituting rent as defined in subsection (g)), royalties (other than mineral, oil, or gas royalties), annuities.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

In the instant case it is clear that the insurance company had no funds of its own with which to finance itself during the initial period of its existence and that petitioner agreed to advance it certain funds under the terms of a participating agreement entered into by the two corporations under which petitioner was to receive 2 percent of annual gross premiums of the insurance company over a period of 16 years. There was also a provision in the participating agreement which reads:

> * * * If said two per cent. of the gross annual premiums does not equal or exceed eight per cent. per annum any current year of the total amount of such Certificates outstanding such year, then and in that event the First Party will pay to the Second Party, in addition to said two per cent. of the said gross annual premiums, the difference between said two per cent. and eight per cent. of said total of outstanding certificates. * * *

The sums which were advanced by petitioner to the insurance company under the terms of this participating agreement were set up on the books and records of the insurance company as "surplus contributions" or "advanced to surplus."

While petitioner, under the terms of the agreement, agreed to advance to the insurance company sums of money up to a total of $50,000, the stipulated facts show that from 1930 to 1936, inclusive, petitioner advanced to the insurance company a total of only $15,674.76. Petitioner, although it had an authorized capital stock of $100,000, never issued but a small amount of this capital stock and was at all times here involved a corporation with a small amount of assets. It appears not to have advanced any further sums since 1936. The insurance company, under the terms of the agreement, repaid to petitioner on principal during the years 1932 to 1940, inclusive, the sum of $15,668.97. This left at the end of the year 1940 only $5.79 unpaid of the amounts which petitioner had advanced to the insurance company in prior years. Notwithstanding that the insurance company had practically repaid at the end of 1939 all the sums which had been advanced to it by petitioner in prior years, it is stipulated that in 1940 a further 2 percent on $22,446.34 of premium income accumulated to petitioner's credit, amounting to $448.93. In other words, the 2 percent on annual premiums of the insurance company continued to be accrued by the insurance company to the credit of petitioner under the participating agreement notwithstanding the insurance company had repaid to petitioner all advances except the small sum of $5.79.

In 1940 the contract still had six years to run and, so far as the record shows, this 2 percent of gross premiums will be paid to petitioner during the remainder of this time, notwithstanding that only a nominal amount of the advancements remain unpaid. Are these annual payments to petitioner under the terms of the participating agreement "interest" as that term is used in section 502 (a)? The

word "interest" as used in section 502 (a), I. R. C., carries its usual and ordinarily understood meaning. Cf. *Elverson Corporation, supra.*

Mertens, in his Law of Federal Income Taxation, vol. 4, sec. 26.01, in speaking of the deduction for interest which is allowed to tax-payers by the statute, says:

> * * * There is no requirement that deductible interest be ordinary and necessary or reasonable. However, there are distinct conditions precedent to the deductibility of interest. The statute requires that there should be an *indebtedness*, that there should be interest upon it, and that what is claimed as an interest deduction should have been paid or accrued within the year. * * * [Emphasis supplied.]

And the same author, in section 26.04 of the same volume, under the heading "What Constitutes Indebtedness," says:

> * * * The term "indebtedness" as used in the revenue act implies an unconditional obligation to pay.
>
> A contingent or inchoate claim may be a liability, but it is not a debt, at least until the contingency happens. It follows that interest "calculated for cost-keeping or other purposes on account of capital or surplus invested in the business which does not represent a charge arising under an interest-bearing obligation" is not deductible. * * * [Citing certain Treasury regulations.]

In the instant case there were no interest-bearing obligations. What happened was in substance this: A small mutual life insurance company was chartered under the laws of the State of Montana. Having no capital stock, someone had to finance its expenses and death losses in the initial stages of its existence. Petitioner undertook this function and entered into a participating agreement with the insurance company by which it agreed to advance the insurance company, from time to time as it might need the funds, sums of money which were not to exceed at any one time $50,000. As has already been stated, petitioner was to receive for this financial sustenance which it gave the infant insurance company 2 percent of the insurance company's gross premiums over a period of 16 years, but in no event was this 2 percent of gross premiums to be less than 8 percent per annum on the advancements outstanding. There was no unconditional agreement that these sums advanced by petitioner to the insurance company should be repaid. On the contrary, these advances were to be repaid to petitioner "only and upon the condition" that the insurance company's surplus attain certain proportions and its solvency at the time be not threatened by the payment of such principal sums. Not only was there no unconditional obligation on the part of the insurance company to repay the principal sums advanced, but the obligation to make the annual payments of 2 percent of the gross premiums was not unconditional. The participating agreement with reference to these annual payments provided:

\* \* \* If such payments any year should jeopardize the solvency or sound financial condition of the First Party, the whole or any part thereof, may be made by like certificates of indebtedness subject to the limitation upon the amount of the total of such certificates outstanding at any time hereinafter contained.

As we have already stated, the insurance company set up these advancements of principal sum to it on its books not as loans, but as "surplus contributions" or "advanced to surplus." And annual payments to petitioner of the agreed payments of 2 percent of gross premiums are continuing to be made although the advancements have been, with the exception of a very small amount, repaid. So, while undoubtedly the annual payments made by the insurance company to petitioner under the terms of the participating agreement possess some of the characteristics of interest, we do not think such payments are interest as that term is used in section 502 (a), Internal Revenue Code. These amounts were income to petitioner under section 22 (a), as we have already decided under the first issue, but, for reasons which we have stated above, we do not think these payments were interest. Cf. *Elverson Corporation, supra.* We, therefore, hold that petitioner was not a personal holding company in the taxable year. The Commissioner erred in determining a personal holding company surtax against petitioner.

We think the instant case is distinguishable on its facts from *Benjamin Franklin Life Assurance Co.*, 46 B. T. A. 616, in which we held that certain sums paid by the taxpayer as interest pursuant to the terms of certificates of indebtedness which it had issued to a management corporation were properly deductible as interest, pursuant to section 203 (a) (8), Revenue Act of 1934. We rested our decision in that case largely on a California statute under which the certificates of indebetedness had been issued. In the instant case both the insurance company and petitioner are Montana corporations and we have been cited to no Montana statute which is similar to the California statute upon which we largely relied in the *Benjamin Franklin Life Assurance Co.* case. Therefore we think the cases are distinguishable.

We think the instant case is also distinguishable on its facts from *Manhattan Mutual Life Insurance Co.*, 37 B. T. A. 1041, which was cited and relied upon in *Benjamin Franklin Life Assurance Co., supra.* These two cases have been carefully examined and considered by us, and we do not think they compel a different result from that which we have reached on the personal holding company issue which we have to decide.

Petitioner's assignment of error (c) alleges that the Commissioner erred in determining a 25 percent penalty of the amount of personal holding company surtax because of petitioner's failure to file a per-

sonal holding company return on Form 1120H. Naturally, if petitioner was not a personal holding company in 1940 it was under no legal requirement to file a personal holding company return on Form 1120H, and its failure to do so would not subject it to any penalty. We sustain petitioner in its assignment of error (c).

Reviewed by the Court.

> *Decision will be entered that there is a deficiency in petitioner's income tax for the year 1940 of $792.05 and a deficiency in petitioner's declared value excess profits tax of $613.34, and that there is no deficiency in personal holding company surtax or penalty.*

MELLOTT, *J.*, concurs only in the result.

---

MURDOCK, *J.*, dissenting: The petitioner never agreed to do anything but lend money to the insurance company. Actually it advanced a total of $15,674.76. The agreement provided that the insurance company should compensate the petitioner for advancing funds, and the $6,135 is a part of the amount which the insurance company paid, in accordance with its agreement, to the petitioner for the use of the petitioner's money. These payments were solely to compensate the petitioner for the loan of its money. They were part of the amounts fixed by the parties for the use of money. These circumstances, according to my understanding of the law, would make this $6,135 interest when received by the petitioner. Furthermore, this case seems to come within the intendment of the personal holding company provisions of the statute, so much so that the reason advanced why this might not be interest would tend to bring the payment into some other class of personal holding company income, such as dividends or profit on sale of an interest in the corporation.

STERNHAGEN, DISNEY, and OPPER, *JJ.*, agree with this dissent.

---

TURNER, *J.*, dissenting: Stripped of verbiage the agreement here in question provided that the petitioner should in any event receive 8 percent per annum on the balance of its advances to the insurance company, and the facts show that $6,235.44 of the $6,704.66 which had accrued under the agreement represented 8 percent on such balances for the years 1930 through 1939. Such being the facts, the sound conclusion, in my opinion, would be that at least $6,235.44 of the amount accrued was interest. See and compare *Manhattan Mutual Life Insurance Co.*, 37 B. T. A. 1041. It is true that under the agreement the payments by the insurance company, whether of the

8 percent on the balance of the advances or the 2 percent of gross premiums, were not required to be in cash if such payments in "any year should jeopardize the solvency or sound financial condition" of the insurance company. In that circumstance, however, the insurance company was not relieved of its obligation to make the said payments, but, in the alternative, had the privilege of issuing certificates of indebtedness therefor. There does seem to have been some limitation on the amount of such certificates that might be outstanding at any one time, but I do not understand that there was any showing or claim that such limit was ever reached or even approached. Furthermore, it is to be noted that the obligation of the insurance company to pay a minimum of 8 percent on the balances advanced is to continue "until payment in full  *  *  *  of all Certificates of Indebtedness issued by it" to petitioner. Under the circumstances here, I am unable to conclude, as the majority does, that the $6,135 paid in the taxable year on the $6,704.66, accrued as above stated, was not interest, and for that reason respectfully note my dissent.

DISNEY and OPPER, *JJ.*, agree with this dissent.